Robert A. ARONSON,
Plaintiff, Appellant,

v.

U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT, et
al., Defendants, Appellees.

No. 86–2083.

United States Court of Appeals,
First Circuit.

Argued May 5, 1987.
Decided June 22, 1987.

James H. Lesar with whom Fensterwald & Alcorn, P.C., Washington, D.C., was on brief, for plaintiff, appellant.

Al J. Daniel, Jr. with whom Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Robert S. Mueller, III, U.S. Atty., Boston, Mass., and Leonard Schaitman, Washington, D.C., were on brief, for defendants, appellees.

Before BOWNES, BREYER ,and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiff-appellant Robert A. Aronson appeals from summary judgment by the United States District Court for the District of Massachusetts in a Freedom of Information Act (FOIA) suit. Aronson sought to compel the United States Department of Housing and Urban Development (HUD) to release information concerning individuals whose mortgages were insured under the National Housing Act and who are entitled to receive reimbursements, known as "distributive shares," from HUD upon the termination of the insurance. Aronson wished to use the information in order to locate those individuals and to offer, for a fee, to help them obtain the money from HUD. HUD claimed that the release of the information would constitute a "clearly unwarranted invasion of privacy" and that the information was, therefore, exempt from disclosure under FOIA's "Exemption 6." *See* 5 U.S.C. § 552(b)(6) (1982).

## I.

### A. *"Distributive Shares"*

HUD, through the Federal Housing Administration, insures lenders against loss from default by certain mortgagors eligible for such insurance under the provisions of the National Housing Act. *See* 12 U.S.C. § 1709 (1982). Lenders pay insurance premiums and pass the costs on to the mortgagors. The premiums are deposited in the Mutual Mortgage Insurance Fund which is administered by HUD. *See id.* at §§ 1709–11; 24 CFR §§ 203.420–26 (1986). The Fund consists of two accounts, the General Surplus Account and the Participating Reserve Account. 24 CFR § 203.420. Upon the termination of HUD's insurance obligation, the mortgagor is entitled to receive a "distributive share" of any surplus in the Participating Reserve Account. *Id.* at § 203.423(a).

HUD is obligated to distribute any such payments "in such manner and amount as the Secretary shall determine to be equitable and in accordance with sound actuarial and accounting practice." 12 U.S.C. § 1711(c). Despite this statutory mandate, HUD's performance throughout the 1970's in distributing shares to mortgagors was gravely deficient. In February, 1981, the Comptroller General reported that, "as of March 31, 1980, there were 198,000 unpaid shares totaling $52 million." The report declared that HUD did not have effective procedures for informing mortgagors about possible premium refunds, for obtaining mortgagors' mailing addresses or for locating mortgagors when its routine tracing procedures failed.

HUD's poor performance in locating and reimbursing mortgagors provided an opportunity for private tracing operations. Through a FOIA request, the tracer sought HUD's records giving the mortgagors' names, last known addresses and the

amount owed them by HUD. If the tracer succeeds in locating an eligible recipient, he offers his services in helping to recover the money in exchange for a percentage of the reimbursement amount.

In 1980, HUD's General Counsel stated that HUD had a duty to release such information under FOIA. Recognizing HUD's deficiencies in distributing funds to mortgagors, she found that the "very strong public interest in locating the distributive share recipients" outweighed any invasion of privacy caused by the release of the information. HUD, therefore, adopted a policy of acceding to the FOIA requests.

HUD also began instituting new procedures for locating mortgagors, which are described in an affidavit by Donald C. Demitros, HUD's Director of Mortgage Insurance and Accounting. In 1981, mortgagees were required to notify mortgagors, both at the time of the origination of the loan and at the termination of the insurance, of their eligibility for refunds. In 1982, HUD required mortgagees to provide mortgagors' social security numbers to HUD. In 1984 and 1985, HUD provided additional information to mortgagees and requested mortgagees to provide HUD with the mortgagors' names and addresses and to notify mortgagors of their eligibility for refunds.[1] HUD also streamlined certain of the forms used in this process. HUD attempted to locate mortgagors by sending a series of letters and follow-up letters to the mortgagors, the mortgagees, and the current occupants, if other than the mortgagor, of the insured property. This process required approximately twelve months.

In 1984, a memo from HUD's Office of General Counsel declared that the new procedures had changed the balance of interests under FOIA. The new procedures, the memo stated, meant that private tracers were obtaining fees from individuals who would otherwise have received the full amount of their shares from HUD's own tracing efforts. The memo found that there was an insufficient public interest to warrant the invasion of privacy that would

be caused by releasing the information during HUD's year-long search process.

HUD began to withhold the information from tracers for one year after the vesting of the distributive shares. This action appears to have been partly motivated by complaints received by congressional representatives from constituents who had been contacted by private tracers. In January, 1985, HUD announced in a letter to Congressman J.J. Pickle that it was lengthening to two years the amount of time it would withhold the information in order to accomodate newly expanded tracing efforts.

HUD also began applying the two-year period for withholding information to unclaimed shares that vested before December 31, 1979, and that had become "reactivated" as a result of a ruling issued by the Comptroller General in November, 1985. The Comptroller General had reversed HUD's earlier position and found that the statute of limitations did not apply to distributive shares. As a result of this change, owners of shares vesting before December 31, 1979, again became eligible for reimbursements. HUD decided that it needed another two years to search for those eligible for these shares and that it would not, therefore, release information to private tracers during that time.

## B. The District Court's Decision

Robert A. Aronson was one of the private tracers seeking to obtain fees from mortgagors in return for helping obtain the insurance refunds due them. Aronson's usual fee was 35% of the refund amount. HUD complied with Aronson's FOIA requests in 1983 and 1984. In January, 1986, Aronson sent HUD a request for the entire file of unpaid distributive shares that had vested as of December 31, 1985. In accordance with its two-year search policy, HUD decided to release the information only for shares vesting between December 31, 1979, and December 31, 1983. Aronson brought suit in district court attempting to compel

1. We note that Aronson claimed, at oral argument, that mortgagors are not generally notified

by mortgagees of their eligibility for refunds at the time of the termination of the insurance.

HUD to release the remainder of the information.

The district court decided the suit on cross-motions for summary judgment. The court found that it was required to balance the privacy interests of mortgagors impinged upon by disclosure against the "very strong public interest in seeing that share owners entitled to receive these funds do so." The court found that HUD was justified in refusing to disclose information for shares vesting after December 31, 1983. The court based its decision on HUD's recent implementation of its new tracing procedures. It found that the benefit in possibly slightly faster tracing by private companies did not outweigh the substantial privacy interests in mortgagors' names, addresses and the amount owed them by HUD.[2] The court held, however, that the balance tipped in favor of disclosure for shares vesting before December 31, 1979. It reasoned that HUD's new procedures would not affect those cases and that the privacy interests in such "stale" information was considerably less than that in the more recent data. Aronson appeals from the decision concerning shares vesting after December 31, 1983; HUD has decided not to pursue an appeal of the decision concerning the shares vesting before 1980.

## II.

FOIA exempts from disclosure information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This provision, known as "Exemption 6," imposes a two-part test. The first part concerns the nature of the files containing the information. This "similar files" test must be construed in broad terms. See Department of State v. Washington Post Co., 456 U.S. 595, 102

S.Ct. 1957, 72 L.Ed.2d 358 (1982). Files containing financial information, like those at issue here, clearly fall into the cateogory of files "similar" to personnel and medical records.

We proceed, therefore, to the critical balancing of public against private interests to determine whether disclosure would be "clearly unwarranted" under Exemption 6. See id. at 599, 102 S.Ct. at 1960. It cannot be gainsaid that there is a strong public interest in disclosure when that disclosure would lead to the distribution of refunds that would otherwise have little chance of reaching their rightful owners. HUD recognized this public interest in its pre–1984 policy of releasing information on all eligible mortgagors. It continues to recognize this interest today in its policy of releasing information after the two-year search period. The public interest is manifestly served by the disclosure and consequent disbursement of funds the government owes its citizens. The problem of nondisbursement in this context is dramatized by the alarming figure of $52 million the government had failed to distribute as of March, 1980. The public interest in the release of the information, and in the attendant correction of the problem of nondisbursement, is consistent with FOIA's goals of the exposure of agency action to public inspection and oversight. See Department of Air Force v. Rose, 425 U.S. 352, 360–61, 96 S.Ct. 1592, 1598–99, 48 L.Ed.2d 11 (1976).

We rule that we should not consider Aronson's commercial motivations in seeking disclosure when we measure the public interest in the release of the information. "Congress did not differentiate between the purposes for which information was requested." FBI v. Abramson, 456 U.S. 615, 631, 102 S.Ct. 2054, 2064, 72 L.Ed.2d 376 (1982) (citation omitted).[3] In-

---

**2.** In the district court, the parties argued about whether HUD's computers had the capability to separate the minimal information needed by Aronson—names, addresses and refund amounts—from certain other personal data. The district court found this question irrelevant to its decision on the merits. On appeal, HUD

does not appear to dispute the finding that any extra information shown on its records would not critically affect the balance of interests.

**3.** Although Abramson was a case decided under Exemption 7, the Court's reasoning clearly applied to similar language in Exemption 6, and

formation whose disclosure would be socially beneficial in the hands of an altruistic defender of the public's rights cannot, without a showing of a significant invasion of privacy, be withheld from anyone. Indeed, "Congress granted the scholar and the scoundrel equal rights of access to agency records." *Durns v. Bureau of Prisons,* 804 F.2d 701, 706 (D.C.Cir.1986). Accordingly, in determining the public interest served by disclosure, we have distinguished between the weight of that interest and the likelihood that the particular party seeking disclosure would actually use the information to benefit the public. *See Kurzon v. Department of Health and Human Services,* 649 F.2d 65, 68 (1st Cir.1981). The rights of a party seeking disclosure "are not lessened, any more than they are enhanced, by the private purpose for which the documents are sought." *Columbia Packing Co. v. United States Department of Agriculture,* 563 F.2d 495, 499–500 (1st Cir.1977).

A more complicated inquiry is involved in considering the second part of the balancing test, the privacy interests at stake in disclosing the information. The district court found very significant the privacy interest in the confidentiality of names and addresses. The court noted the "common use of unlisted telephone numbers and post office boxes" in support of its view. While we do not dismiss out of hand the privacy interest in one's address, we do not find it of crucial significance here. There is no showing in the record that the practice of keeping one's address out of reach of the postman is that of a majority or even of a significant percentage of the citizenry. We have not hesitated in the past to allow disclosure of names and addresses when there has been a strong public interest in favor of disclosure and when a significant

privacy interest other than the release of addresses was lacking.[4] *See Kurzon v. Department of Health and Human Services,* 649 F.2d 65 (ordering release of names and addresses of unsuccessful grant applicants in the absence of a showing of stigma). *Cf. New England Apple Council v. Donovan,* 725 F.2d 139 (1st Cir.1984) (preventing release of names of law enforcement officials due to possibility of harassment and in the absence of a showing of public interest in disclosure).

The privacy interest becomes more significant, however, when names and addresses are combined with financial information. Aronson's commercial motivations are irrelevant for determining the *public interest served* by disclosure; they do, however, suggest one of the ways in which *private interests* could be *harmed* by disclosure and a reason why individuals would wish to keep the information confidential. When it becomes a matter of public knowledge that someone is owed a substantial sum of money, that individual may become a target for those who would like to secure a share of that sum by means scrupulous or otherwise. We think that eligible mortgagors have a significant interest in avoiding becoming such targets whether or not they presently know that they are entitled to a refund. However one may judge the social value of Aronson's business, one cannot deny that his activities, or those of others possessed of the same information, may result in mortgagors receiving considerably less money than if HUD promptly distributed the refunds without the intervention of third parties.

We agree with the district court that this case requires a careful balancing of the public interest in disclosure against the invasions of privacy that may result. The question is where the line should be drawn

disapproved of a contrary approach previously taken by courts such as the D.C. Circuit. *See Reporters Committee for Freedom of the Press v. United States Department of Justice,* 816 F.2d 730, 742, (D.C.Cir.1987) (finding that *Abramson* rejected the approach taken in the Exemption 6 case of *Getman v. NLRB,* 450 F.2d 670 (D.C.Cir. 1971)).

**4.** Aronson has made much of the fact that mortgagors' names and addresses are likely to be on public record due to the property recording

requirements in many states. *See, e.g.,* Mass. Gen.L.Ann. ch. 185, § 61 (1977) (name and address of grantee required on recordable property deed). We need not, however, enter into a discussion of this issue. As should become clear below, we find the more significant privacy interest not in the mere release of names and addresses but in the identification of those names and addresses as those of future recipients of a substantial sum of money.

between the rightful claims of these conflicting interests. In drawing that line, we are aware that Exemption 6 applies only to invasions of privacy that are *"clearly"* unwarranted," and that the burden is on the government to prove that its withholding of information was justified under this standard. *See* 5 U.S.C. § 552(a)(4)(B).

■ We find that the public interest in disclosure does not outweigh the potential invasions of privacy for as long as HUD is actively searching for eligible mortgagors, provided that that search is conducted within a reasonable time. Release of the information immediately upon the vesting of the shares would trigger a race between HUD and private tracers to find the eligible mortgagors. We note that, as of July, 1984, HUD's records show distributive share data up to the current date; thus, should the information be released immediately, the competition between HUD and the private tracers would begin upon the vesting of the shares. A mortgagor might sign over 35% of his refund to a private tracer when he would have received his check from HUD in any event shortly thereafter. No one's interest is served by such an arrangement, except that of the tracers' pecuniary advancement.

On the basis of the foregoing considerations, we find that HUD's tracing procedures for the first year after the vesting of the shares justified the withholding of the information from FOIA requesters for that period of time. The year-long procedures, and the amount of time they require for implementation, are described fully in the Demitros affidavit. Absent any showing by Aronson that these procedures are unreasonable, ineffective, or not in accord with accepted practice, we do not think it is unreasonable to allow HUD a year to search for eligible mortgagors. The record does not include statistics for HUD's effectiveness in finding mortgagors under the new procedures.[5] We cannot, however, on the basis of mere speculation, find unreasonable a set of procedures that are clearly described and whose implementation requires only one year.

■ But the situation with regard to HUD's activities during the second year of its search procedures is quite murky. In his affidavit, Demitros describes several activities which purport to justify the second year of the witholding of the information. He does not, however, clearly indicate how long these procedures are actively pursued nor does he clearly describe the nature of several of them. Rather, Demitros refers to the procedures purportedly justifying a second year as HUD's "expanded efforts" and describes them in vague terms. They consist, first, in enlisting the "resources of our field offices" and "the cooperative efforts of states." Neither the "resources" nor the "efforts" are defined, nor is it explained why they cannot be efficiently employed within the first year of the search. We note also that only twenty-seven states have been contributing their "efforts." Second, HUD attempts to contact the current occupant of the insured property and requests the whereabouts of the former owner. This procedure, however, appears to be identical to one of the activities pursued in the first year. *See* *supra* at 184. We wonder what is to be gained by repeating this action if it has proven futile in the first year. Presumably, the current occupant of the property is not more likely to know the whereabouts of the original mortgagor after another year has passed. Finally, the Department "responds to numerous media inquiries regarding unpaid shares by furnishing for media distribution procedural information and guidance." We observe, once more, that the affidavit does not give the time period during which such inquiries may be said to be "numerous." Nor does it explain why HUD does not furnish such information to the media on its own initiative on a continuous basis. We do not think HUD may be viewed as actively pursuing eligible mortgagors when it simply waits to be contacted by the media.

The Demitros affidavit, in sum, leaves vague the nature and merit of HUD's search procedures during the second year.

5. Demitros projected a rate of 88–95% without offering any basis for his hypothesis; at oral argument, HUD's counsel listed rates for 1984– 1986 without giving the precise source of the numbers or making any written submission on the matter.

We find this vagueness particularly disturbing in the context of the second year because HUD's burden for justifying the continued retention of the information increases with the passage of time. The public interest in the disclosure of the information and the disbursement of the funds rises as the months pass and money belonging to citizens remains in the government's coffers. With the passage of time, it becomes less and less "clear" that the disclosure of information is not "warranted," as those terms are used in FOIA Exemption 6.

Given the vagueness of the government's affidavit in respect to the second year, we do not agree with the district court that the government has shown that the public interest in a more prompt reimbursement of funds is "slight" as long as that disbursement takes place within two years. For many, perhaps most, people, the sums of money involved here are of substantial significance. If, as the district court found, there is a great public interest at some point in assuring the disbursement of these funds through public disclosure, we think, on the basis of the present affidavits, that this interest should be considered as quite substantial after an entire year of fruitless efforts by the government. This interest is not simply that in the achievement of justice in a particular case, but in the revelation and consequent correction of an inability of HUD to disburse funds to their rightful owners.

### III.

In reviewing a district court's grant of summary judgment, we apply the same standard as the district court. *Moreau v. James River-Otis, Inc.*, 767 F.2d 6, 9 (1st Cir.1985). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

We find that the evidence offered by HUD only justifies the withholding of information for one year after the vesting of the shares. Consequently, we find that HUD was entitled to summary judgment only with regard to shares vesting before December 31, 1984. We find that HUD did not meet its burden of proving, "as a matter of law," that the second year of its search procedures justified the retention of information on shares vesting during 1985. We have taken the affidavit at face value, construed it in the light most favorable to HUD, and found nothing that would show that HUD is following sufficiently important or unified search activities during the second year as to make the release of information "clearly unwarranted," as required by Exemption 6. In light of the affidavit's inadequacy, it appears that after HUD's first year of search efforts, the public interest in disclosure grows and the privacy interests diminish. As a result, the balance of interests tips in favor of disclosure. We, therefore, find that Aronson should have been granted summary judgment in regard to the shares vesting between December 31, 1984, and December 31, 1985.

*Affirmed in part, reversed in part.*