**Mary E. FARNUM, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Defendant.**

**Civ. No. 87–CV–74107–DT.**

United States District Court, E.D. Michigan, S.D.

June 27, 1988.

John J. Murray, Center Line, Mich., for plaintiff.

L. Michael Wicks, Asst. U.S. Atty., Detroit, Mich., for defendant.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

#### A.

This is a Freedom of Information Act (FOIA) case, 5 U.S.C. § 552. On July 17, 1987 plaintiff Mary Farnum filed a FOIA request seeking to compel defendant United States Department of Housing and Urban Development to release information concerning individuals whose mortgages were insured under the National Housing Act, see 12 U.S.C. § 1709, and who are entitled to receive reimbursements, known as "distributive shares" or "refunds", from defendant upon termination of their federally insured mortgage insurance. Specifically, plaintiff sought a list of the mortgagors' names, addresses and original loan amount. Plaintiff desired the information in order to locate the mortgagors and to offer, for a fee (typically a percentage of the reimbursement), to help them obtain the money from defendant.

The following excerpt taken from *Aronson v. U.S. Dep't of HUD*, 822 F.2d 182, 183–84 (1st Cir.1987), gives the general background of this and similar cases:

> HUD, through the Federal Housing Administration, insures lenders against loss from default by certain mortgagors eligible for such insurance under the provisions of the National Housing Act. *See* 12 U.S.C. § 1709 (1982). Lenders pay insurance premiums and pass the costs on to the mortgagors. The premiums are deposited in the Mutual Mortgage Insurance Fund which is administered by HUD. *See id.* at §§ 1709–11; 24 CFR §§ 203.420–26 (1986). The Fund consists of two accounts, the General Surplus Account and the Participating Reserve Account. 24 CFR § 203.420. Upon the termination of HUD's insurance obligation, the mortgagor is entitled to receive a "distributive share" of any surplus in the Participating Reserve Account. *Id.* at § 203.423(a).
>
> HUD is obligated to distribute any such payments "in such manner and amount as the Secretary shall determine to be equitable and in accordance with sound actuarial and accounting practice." 12 U.S.C. § 1711(c). Despite this statutory mandate, HUD's performance throughout the 1970's in distributing shares to mortgagors was gravely deficient. In February, 1981, the Comptroller General reported that, "as of March 31, 1980, there were 198,000 unpaid

shares totaling $52 million." The report declared that HUD did not have effective procedures for informing mortgagors about possible premium refunds, for obtaining mortgagors' mailing addresses or for locating mortgagors when its routine tracing procedures failed.

HUD's poor performance in locating and reimbursing mortgagors provided an opportunity for private tracing operations. Through a FOIA request, the tracer sought HUD's records giving the mortgagors' names, last known addresses and the amount owed them by HUD. If the tracer succeeds in locating an eligible recipient, he offers his services in helping to recover the money in exchange for a percentage of the reimbursement amount.

In 1980, HUD's General Counsel stated that HUD had a duty to release such information under FOIA. Recognizing HUD's deficiencies in distributing funds to mortgagors, she found that the "very strong public interest in locating the distributive share recipients" outweighed any invasion of privacy caused by the release of the information. HUD, therefore, adopted a policy of acceding to the FOIA requests.

HUD also began instituting new procedures for locating mortgagors, which are described in an affidavit by HUD's Director of Mortgage Insurance and Accounting. In 1981, mortgagees were required to notify mortgagors, both at the time of the origination of the loan and at the termination of the insurance, of their eligibility for refunds. In 1982, HUD required mortgagees to provide mortgagors' social security numbers to HUD. In 1984 and 1985, HUD provided additional information to mortgagees and requested mortgagees to provide HUD with the mortgagors' names and addresses and to notify mortgagors of their eligibility for refunds. HUD also streamlined certain of the forms used in this process. HUD attempted to locate mortgagors by sending a series of letters and follow-up letters to the mortgagors, the mortgagees, and the current occupants, if other than the mortgagor, of the insured property. This process required approximately twelve months.

In 1984, a memo from HUD's Office of General Counsel declared that the new procedures had changed the balance of interests under FOIA. The new procedures, the memo stated, meant that private tracers were obtaining fees from individuals who would otherwise have received the full amount of their shares from HUD's own tracing efforts. The memo found that there was an insufficient public interest to warrant the invasion of privacy that would be caused by releasing the information during HUD's year-long search process.

HUD began to withhold the information from tracers for one year after the vesting of the distributive shares. This action appears to have been partly motivated by complaints received by congressional representatives from constituents who had been contacted by private tracers. In January, 1985, HUD announced in a letter to Congressman J.J. Pickle that it was lengthening to two years the amount of time it would withhold the information in order to accommodate newly expanded tracing efforts. Further explanation will clarify the background of this case.

For home mortgages insured by the Federal Housing Administration prior to September 1, 1983, upon termination of the insurance obligation the homeowner becomes eligible to receive a "distributive share" of the insurance premiums paid pursuant to the Mutual Mortgage Insurance (MMI) program, as explained above. Beginning at the loan origination, this type of premium was financed by the mortgagor and paid in monthly installments, as part of the mortgage payment, throughout the loan term.

However, for those mortgages insured as of September 1, 1983 and thereafter, due to an amendment to the National Housing Act, upon termination of the insurance obligation the homeowner becomes eligible to receive a "refund" of the insurance premium paid pursuant to the Mortgage Insurance Premium (MIP) program. This type

of premium is financed by the mortgagor in a lump sum at the origination of the loan.

### B.

By letter dated July 31, 1987 defendant informed plaintiff that it would provide her with a list only of unpaid distributive shares for MMI mortgages retired for more than two years at a cost of $123. Defendant declined to give plaintiff any information on unpaid distributive shares less than two years old and also declined to give any information on unpaid refunds for MIP mortgages, contending that FOIA exemption 6 applied to prevent such disclosure, i.e., "personnel and medical files and similar files" which would constitute a "clearly unwarranted invasion of personal privacy."

Federal regulations dictate that FOIA requests which will cost over $25 do not have to be prepaid in order to be filled. Regulations also require that in such cases, the governmental agency involved must afford the FOIA requester to consult with the agency in order to reformulate the request to reduce the cost. This information was conveyed to plaintiff after defendant received her request; she chose not to contact the agency at all and instead filed suit on November 12, 1987 to compel disclosure.

On December 22, 1987, after filing suit, plaintiff first administratively appealed defendant's failure to completely fill her FOIA request. The Assistant General Counsel for Administrative Law affirmed defendant's decision.

After plaintiff filed an affidavit with the Court on January 29, 1988 to the effect that her original request, to the extent it was allowed by defendant, still had not been filled, defendant apparently sent plaintiff a list of unpaid MMI distributive shares more than two years old.

### C.

Before the Court are the parties' cross motions for summary judgment. Plaintiff contends that on the authority of *Aronson v. U.S. Dep't of HUD, supra,* she is entitled to a list of unpaid MMI distributive shares current to one year after the mortgages are retired and requests the same for the unpaid MIP refunds. Defendant, on the other hand, argues that its initial decision on plaintiff's FOIA request, i.e., that she can have a two-year-old list of unpaid distributive shares and no information on MIP refunds, is valid and that certain agency actions taken subsequent to the decision in *Aronson,* described more particularly *infra,* warrant a different result than the decision in *Aronson.* In support of its decision on plaintiff's FOIA request, defendant relies on *Heights Community Congress v. Veterans Administration,* 732 F.2d 526 (6th Cir.1984).

For the reasons which follow, the Court concludes that *Aronson* may now be distinguished from the facts in this case by virtue of agency actions taken subsequent to that decision and that defendant's motion for summary judgment with respect to plaintiff's FOIA request on the unpaid MMI distributive shares will be granted. However, the Court further concludes that with respect to withholding information on unpaid MIP refunds, defendant has advanced no rational justification why this information, at least insofar as defendant's two-year searching procedures have proved futile, should not be subject to the same disclosure rule as the MMI mortgages and that plaintiff's motion for summary judgment with respect to her FOIA request on the MIP mortgages will be granted, as qualified by the two-year, rather than the one-year, limitation on disclosure.

### II.

The Court of Appeals for the Sixth Circuit in *Heights Community Congress v. Veterans Administration, supra,* 732 F.2d at 528–29, concisely explained the law still currently applicable to this case:

Exemption 6 provides that the disclosure requirements of the FOIA do not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This section has been held to create a two-part test: (1) does the file

include personnel, medical or "similar" data; and (2) if so, would disclosure be a "clearly unwarranted" invasion of personal privacy. *United States Dept. of State v. Washington Post Co.*, 456 U.S. 595, 601–02, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982).

■ In addressing the threshold requirement, the Supreme Court in *Washington Post, supra*, held that a "similar" file was not to be construed as encompassing "a narrow class of files containing only a discrete kind of personal information." *Id.* 456 U.S. at 601–02, 102 S.Ct. at 1961. Rather, Exemption 6 was to be applied to "any Government records on an individual which can be identified as applying to that individual." *Id.* As stated by the Supreme Court, Congress intended that this "general exemption" would, in turn, be "held within bounds" by the second requirement of Exemption 6, which precludes release of such individual information when it would constitute a "clearly unwarranted invasion of personal privacy." *Id.* 456 U.S. at 599–601, 102 S.Ct. at 1960.

In *Dept. of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the Supreme Court mandated that the court balance the individual's right to privacy against disclosure's benefit to the public interest in determining if the disclosure would result in a "clearly unwarranted invasion of personal privacy":

Congressional concern for the protection of the kind of confidential personal data usually included in a personnel file is abundantly clear. But Congress also made clear that nonconfidential matter was not to be insulated from disclosure merely because it was stored by an agency in its "personnel" files. Rather, Congress sought to construct an exemption that would require a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act "to open agency action to the light of public scrutiny." The device adopted to achieve that balance was the limited exemption, where privacy was threatened, for

"clearly unwarranted" invasions of personal privacy.

Both House and Senate Reports can only be read as disclosing a congressional purpose to eschew a blanket exemption for "personnel ... and similar files" and to require a balancing of interests in either case. Thus the House Report states, H.R.Rep. No. 1497, p. 11: "The limitation of a 'clearly unwarranted invasion of personal privacy' provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which might harm the individual." Similarly, the Senate Report, S.Rep. No. 813, p. 9, states: "The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information."

425 U.S. at 372, 96 S.Ct. at 1604.

In performing the balancing test, the clear majority of circuits have employed a two prong approach: (1) identification of the privacy interest at stake; and (2) specification of the public interest in disclosure. *See Madeira Nursing Center, Inc. v. N.L.R.B.*, 615 F.2d 728, 730 (6th Cir.1980):

The central inquiry is whether public access to the information * * * is tantamount to an invasion of privacy; if so we ask whether such an invasion is justified by any countervailing public benefit from disclosure.

*Accord, Washington Post Corp. v. U.S. Dept. of H.H.S.*, 690 F.2d 252, 261 (D.C. Cir.1982); *Harbolt v. Dept. of State*, 616 F.2d 772, 775 (5th Cir.1980); *Wine Hobby USA, Inc. v. IRS*, 502 F.2d 133, 137 (3rd Cir.1974); *Rural Housing Alliance v. U.S. Dept. of Agriculture*, 498 F.2d 73, 77 (D.C.Cir.1974). *But see Robles v. EPA*, 484 F.2d 843, 847 (4th Cir.1973). In addition, it has been held in the Ninth and D.C. Circuits that the balancing test

may include consideration of "whether other sources of information might suffice." *Rural Housing Alliance, supra* at 77; *Church of Scientology v. Dept. of Defense,* 611 F.2d 738, 746 (9th Cir.1979). The burden of proof is on the government to justify the exemption. *Ingle v. Dept. of Justice,* 698 F.2d 259, 264 (6th Cir.1983). Further:

> In reviewing determinations made under the FOIA an appellate court is confronted with two responsibilities. Initially the reviewing court must establish that the district court had an adequate factual basis for its decision. Secondly, the court on appeal must ascertain upon the factual foundation developed below if the conclusion of the trial court is clearly erroneous.

*Ingle,* 698 F.2d at 267.

### III.

#### A.

■ There can be no real dispute in this case that the information which plaintiff seeks is subject to the limitation of Exemption 6 of FOIA; both *Heights* and *Aronson* recognize this. Plaintiff attempts to argue that the information she requested is not subject to the exemption and distinguishes *Heights* on the ground that there, the plaintiff was seeking the current address of the homeowner, whereas here, by virtue of the fact that defendant has been unable to locate the mortgagor after one year of searching, she is probably only requesting information containing former addresses, with a consequently lower privacy interest at issue. This argument is unavailing. Plaintiff may not, on the one hand, specifically suggest that defendant is bound by *Aronson* and on the other hand, suggest that the decision does not also bind her. Plaintiff has not advanced any authority for the proposition that there is significantly less of a privacy interest in a former address as opposed to a current address. Whether the information given the FOIA requester in cases such as this is outdated or current, the fact remains that plaintiff desires it in order to discover plaintiff's *current* address. In any event, plaintiff

does not seek merely addresses; she also seeks current, personal financial information.

#### B.

As did the Court of Appeals for the Sixth Circuit in *Heights,* the Court begins by articulating the privacy interests at issue in this case which weigh in favor of nondisclosure of the information requested. Both *Heights* and *Aronson* support the proposition that MMI and MIP mortgagors have privacy interests in their names and addresses. This privacy interest is further enhanced by the fact that plaintiff also seeks the mortgagors' personal financial information. *Aronson, supra,* 822 F.2d at 185. While there is a possibility that the mortgagors are no longer living at the address of the property which was mortgaged, they certainly have a privacy interest in their "whereabouts", information to which the former address may lead.

On the other hand, there are public interests which weigh in favor of disclosure of the information, especially when such disclosure would lead to a insurance premium reimbursement that would otherwise have little chance of reaching the eligible mortgagor. Also, there is the likelihood that the FOIA requester, motivated by financial gain, will use the information received to further this public interest. While *Aronson* suggested that disclosure would also further the purpose of subjecting defendant to "public inspection and oversight", in light of the *type* of information sought here, this consideration seems to be much less significant than the mortgagors' interest in expeditious reimbursements of insurance premiums.

Further, there are circumstances which detract from the articulated public interest aspect of plaintiff's FOIA request. First, if the mortgagors knew about their eligibility for reimbursement, they would undoubtedly be dissatisfied in obtaining anything less than the full amount of their entitlement. Second, the Comptroller General of the United States has found that for purposes of returning the insurance premiums, defendant acts as a trustee with re-

spect to the the mortgagors. *See Comp. Gen.Dec.* B–201669 (Nov. 26, 1985). This decision implies that defendant has a duty to act in the mortgagors' best interests by attempting to first locate and reimburse them in full and by not prematurely releasing the information plaintiff requests without having first used its best efforts to locate and notify the mortgagors.

### C.

■ Based on facts substantially similar to those here, the court of appeals in *Aronson* balanced the respective interests and held that defendant could lawfully decline to disclose a list of those mortgagors who retired their mortgages within one year of the request. This decision overturned defendant's previously articulated policy of nondisclosure for a two-year period. The court of appeals in *Aronson* rejected defendant's arguments as to nondisclosure for the second year, characterizing its new second-year search procedures as "quite murky". The court of appeals then commented on defendant's then-current Director of Mortgage Insurance and Accounting, Donald Demitros's affidavit concerning the procedures, stating:

> In his affidavit, Demitros describes several activities which purport to justify the second year of the witholding of the information. He does not, however, clearly indicate how long these procedures are actively pursued nor does he clearly describe the nature of several of them. Rather, Demitros refers to the procedures purportedly justifying a second year as HUD's "expanded efforts" and describes them in vague terms. They consist, first, in enlisting the "resources of our field offices" and "the cooperative efforts of states." Neither the "resources" nor the "efforts" are defined, nor is it explained why they cannot be efficiently employed within the first year of the search. We note also that only twenty-seven states have been contributing their "efforts." Second, HUD attempts to contact the current occupant of the insured property and requests the whereabouts of the former owner. This procedure, however, appears to be identical to one of the activities pursued in the first year. *See supra* at 184. We wonder what is to be gained by repeating this action if it has proven futile in the first year. Presumably, the current occupant of the property is not more likely to know the whereabouts of the original mortgagor after another year has passed. Finally, the Department "responds to numerous media inquiries regarding unpaid shares by furnishing for media distribution procedural information and guidance." We observe, once more, that the affidavit does not give the time period during which such inquiries may be said to be "numerous." Nor does it explain why HUD does not furnish such information to the media on its own initiative on a continuous basis. We do not think HUD may be viewed as actively pursuing eligible mortgagors when it simply waits to be contacted by the media.

> The Demitros affidavit, in sum, leaves vague the nature and merit of HUD's search procedures during the second year. We find this vagueness particularly disturbing in the context of the second year because HUD's burden for justifying the continued retention of the information increases with the passage of time. The public interest in the disclosure of the information and the disbursement of the funds rises as the months pass and money belonging to citizens remains in the government's coffers. With the passage of time, it becomes less and less "clear" that the disclosure of information is not "warranted," as those terms are used in FOIA Exemption 6.

822 F.2d at 187–88.

While generally agreeing with the analysis in *Aronson,* the Court concludes that on the present record, which appears to be much less vague, or "murky", than that in *Aronson,* defendant's articulated second-year search procedures are now more refined and appear to be reasonably calculated to notify mortgagors of their entitlement to a distributive share or refund. Defendant provides the affidavit of its current Acting Director of the Mortgage Insurance

**1136**

Accounting and Servicing Group, Christopher Peterson, which outlines in detail the new second-year procedures which are presently being put into effect to locate the hard-to-find mortgagors. These procedures include the processing of lists of mortgagors unlocated after the first year through: (a) TRW Credit Agency's credit reference computer database, (b) Metromail, a national credit agency which uses the address-forwarding files of the United States Postal Service, and (c) the Internal Revenue Service's computer database of taxpayer address information. Defendant states, along with the underlying explanation, that these three new procedures, to be utilized if the first-year procedures failed, would take approximately twelve months to complete, thus accounting for the need for the extra year.

Given the detailed new, second-year procedures, apparently not before the panel in *Aronson,* and plaintiff's failure to explain why such procedures would be futile, and defendant's role as a trustee, a circumstance apparently not considered in *Aronson,* the Court concludes that defendant's two-year nondisclosure policy with respect to MMI distributive shares is justified.

However, the Court cannot approve defendant's blanket policy of nondisclosure with respect to MIP refunds. While defendant has advanced evidence to show that it has been almost 100% successful in reimbursing mortgagors within one year of retirement of their mortgage debt, defendant's conclusion that no public interest is advanced by complete nondisclosure of this information is unjustified. Even if defendant's search efforts approach a 100% success rate, there will undoubtedly be a small percentage of mortgagors who are not located and reimbursed after two years of searching, yet those mortgagors also have an interest in being located and notified of their eligibility for a reimbursement by whomever can find them, even "finders" such as plaintiff. There is no reason advanced to explain why the MIP mortgagors not found after two years of searching, however small their number, should merely be forgotten. Accordingly, the Court finds

it appropriate to extend the two-year nondisclosure policy to MIP mortgagors; thereafter, such information must be disclosed.

**IV.**

Both plaintiff's and defendant's motions for summary judgment are GRANTED in part and DENIED in part. Defendant shall provide plaintiff with the information sought in the complaint only with respect to MMI and MIP mortgages which are two years or older at the time the FOIA request is filled.

The Court will retain jurisdiction of this case. On June 15, 1989 defendant shall file a report with this Court which will contain statistics comparing defendant's recent success rate in returning distributive shares and refunds after one, and after two, years. The purpose of this showing will be to determine the efficacy of defendant's new second-year procedures for locating MMI and MIP mortgagors who are entitled to reimbursements. It shall be the duty of the United States Attorney, or a selected designee, to inform the Court if any related cases within the meaning of Local Rule 8 are filed in the Eastern District of Michigan.

SO ORDERED.