**NATIONAL ASSOCIATION OF RETIRED FEDERAL EMPLOYEES**

v.

**Constance HORNER, Director, Office of Personnel Management, Appellant.**

No. 86–5446.

United States Court of Appeals, District of Columbia Circuit.

Argued April 4, 1987.

Decided July 7, 1989.

Al J. Daniel, Jr., Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Michael J. Kator, with whom Joseph B. Scott and Irving Kator, Washington, D.C., were on the brief, for appellee.

Before SILBERMAN, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Constance Berry Newman, Director of the Office of Personnel Management, ap-

peals a decision of the district court ordering OPM, pursuant to the Freedom of Information Act, to disclose to the National Association of Retired Federal Employees the names and addresses of retired or disabled federal employees. OPM appeals on the ground that the requested records are non-disclosable under FOIA Exemption 6, which applies to certain types of files "the disclosure of which would lead to a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Based largely upon the Supreme Court's recent decision in *Department of Justice v. Reporters Committee for Freedom of the Press*, —— U.S. ——, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), we reverse the judgement of the district court.

## I. FACTS

NARFE exists to protect and to further the interests of individuals eligible to participate in the federal Government's civilian retirement system. Between 1979 and 1981, OPM (and its predecessor, the Civil Service Commission) assisted NARFE in its efforts to recruit new members through jointly issued "blind mailings"; NARFE would prepare informational packets that an independent mailing service would then send to newly enrolled federal annuitants. If a recipient responded with an expression of interest, OPM would provide NARFE with his or her name and address.

OPM discontinued its assistance to NARFE in 1982. Without OPM's aid, and without any alternative source for the names and addresses of recent retirees, NARFE's efforts to enroll substantial numbers of new members were frustrated. In early 1985, therefore, it asked OPM, pursuant to FOIA, for a list of "the names and addresses of persons who were added to the annuity rolls between April 1, 1981 and December 31, 1984." OPM denied the request, invoking FOIA Exemption 6.

NARFE then filed suit in the district court. On cross-motions for summary judgment, the court granted NARFE's motion, holding that a person's "relatively minor" privacy interest in control over who has access to his name, address, and status as a federal annuitant is outweighed by "the public interest in disclosure [that] flows from NARFE's services and the fact that many annuitants might be pleased to learn of them." *National Ass'n of Retired Federal Employees v. Horner*, 633 F.Supp. 1241, 1245 (D.D.C.1986). OPM appealed.

After oral argument of the appeal in this court, the Supreme Court granted *certiorari* to review our earlier decision in *Reporters Committee*. Because *Reporters Committee* raised an issue relevant to the present case, we ordered that this case be held in abeyance pending the Supreme Court's decision. After that decision issued, we ordered supplemental briefing on its implications for this case. We now reverse the judgment of the district court.

## II. ANALYSIS

Under FOIA, an agency must disclose all records requested by "any person," 5 U.S.C. § 552(a)(3), unless the information sought falls within a specific statutory exemption. 5 U.S.C. § 552(d). Exemption 6 provides that an agency shall not disclose "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

NARFE does not dispute that the names and addresses of recent annuitants are covered by the phrase "personnel and medical files and similar files," and that Exemption 6 is therefore relevant to them. Accordingly, we must first determine whether their disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest. If no significant privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure. *See Department of Justice v. Tax Analysts*, —— U.S. ——, —— – ——, 109 S.Ct. 2841, 2850-53, 106 L.Ed.2d 112 (1989). If, on the other hand, a substantial privacy interest is at stake, then we must weigh that privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy. *Ripskis v. Department of Housing and Urban De-*

*velopment,* 746 F.2d 1, 3 (D.C.Cir.1984). *Cf. Reporters Committee,* 109 S.Ct. at 1476 (Exemption 7, which covers law enforcement records the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy," calls for a balancing of private against public interests.).

## A. *Privacy Concerns*

The Supreme Court has made clear that Exemption 6 is designed to protect personal information in public records, even if it is not embarrassing or of an intimate nature: "Information such as place of birth, date of birth, date of marriage, employment history, and comparable data is not normally regarded as highly personal, and yet ... such information ... would be exempt from any disclosure that would constitute a clearly unwarranted invasion of personal privacy." *Department of State v. Washington Post Co.,* 456 U.S. 595, 600, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982). The question that remains is the extent of the interference with privacy that would be caused by disclosure of the name, address, and annuitant status information at issue in this case.

Before the Supreme Court decided *Reporters Committee,* NARFE's primary argument was that its planned use of their names and addresses would not occasion significant annoyance to the annuitants. *Reporters Committee* makes clear, however, that this is not the relevant consideration. The Court there held that, with exceptions not here relevant, "the identity of the requesting party has no bearing on the merits of his or her FOIA request," explaining, "The Act's sole concern is with what must be made public or not made public." 109 S.Ct. at 1480–81 (internal quotation omitted). True, the Court made this broad observation in the course of discussing how to assess the public interest in disclosure, not in its consideration of the private interests in non-disclosure. That is not surprising, however, for in that case, the plaintiff reporters, who had requested "rap sheets" (personal criminal histories) of four individuals, were in no position to argue that what they would do with the information would be somehow less intrusive than the uses to which others might put it; the Court was therefore not faced with the question whether "the identity of the requesting party" is equally irrelevant to the private interest side of the balance. We conclude that it is, for two reasons.

First, the Court's statement of the irrelevance principle is not limited in terms to the public interest inquiry; it is in terms applicable to "the Act" as a whole. Second, such a limitation would not make sense. The statute requires that non-exempt files be disclosed to "any person." 5 U.S.C. § 552(a)(3). That is, information available to anyone is information available to everyone. Because a court cannot limit the disclosure of records to particular parties or for particular uses, it would be illogical as well as unfair to the person whose privacy is at stake for the court to balance the public interest in disclosure to the whole world against the private interest in avoiding disclosure only to the party making the request, and to ignore the impact on personal privacy of the more general disclosure that will likely ensue.

In this context, the privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address is significant, as several other circuits have held. *See Department of Agriculture v. FLRA,* 836 F.2d 1139, 1143 (8th Cir.1988); *Minnis v. Department of Agriculture,* 737 F.2d 784, 787 (9th Cir.1984); *Heights Community Congress v. Veterans Administration,* 732 F.2d 526, 529 (6th Cir.1984); *American Federation of Government Employees v. United States,* 712 F.2d 931, 932 (4th Cir.1983); *Wine Hobby USA, Inc. v. IRS,* 502 F.2d 133, 136–37 (3d Cir.1974). In our society, individuals generally have a large measure of control over the disclosure of their own identities and whereabouts. That people expect to be able to exercise that control "is evidenced by ... unlisted telephone numbers, by which subscribers may avoid publication of an address in the public directory, and postal boxes, which permit the receipt of mail without disclosing the location of one's residence." *Heights,* 732 F.2d at 529.

Privacy in the sense of "an individual's control of information concerning his or her person," *Reporters Committee*, 109 S.Ct. at 1476, is not the only interest implicated in this case, moreover. Every list of names and addresses sought under FOIA is delimited by one or more defining characteristics, as reflected in the FOIA request itself; no one would request simply all "names and addresses" in an agency's files, because without more, those data would not be informative. The extent of any invasion of privacy that release of the list might occasion thus depends upon the nature of the defining characteristics, *i.e.*, whether it is significant that an individual possesses them. A non-embarrassing characteristic may or may not be otherwise significant, in a manner relevant to the individual's privacy interests, depending upon whether many parties in addition to the party making the initial FOIA request would be interested in obtaining a list of and contacting those who have that characteristic.

Thus, in *Ditlow v. Shultz*, 517 F.2d 166 (D.C.Cir.1975), a lawyer representing a class of passengers who were overcharged by airlines requested disclosure from Customs records of the names and addresses of individuals who "returned to the United States from Asia or Australia by air sometime between May 1 and September 1, 1973," so that he could notify them by mail that they were members of the class and might be entitled to damages. *Id.* at 170 n. 15. The *Ditlow* court sensibly analyzed the case on the assumption that "the *only* consequence" for those named in the disclosed records would be their receipt of the mailed notice. *Id.* (emphasis added). There is no suggestion, and we can not imagine, that anyone else would use the list for any other purpose.

In *Aronson v. Department of Housing and Urban Development*, 822 F.2d 182 (1st Cir.1987), on the other hand, the court was faced with a request for a list of individuals "owed a substantial sum of money" upon termination of their HUD mortgage insurance policies. *Id.* at 186. There, although the court was ambivalent about whether the release of names and addresses alone would implicate significant privacy interests, it was confident, as are we, that that interest "becomes more significant ... when names and addresses are combined with [such] financial information." *Id.* Said the court, "When it becomes a matter of public knowledge that someone is owed a substantial sum of money, that individual may become a target for those who would like to secure a share of that sum by means scrupulous or otherwise." *Id.*

As in *Aronson*, but not in *Ditlow*, disclosure of the information requested here would interfere with the subjects' reasonable expectations of undisturbed enjoyment in the solitude and seclusion of their own homes. The list at issue here reveals not only the names and addresses of hundreds of thousands of individuals; it also indicates that each is retired or disabled (or the survivor of such a person) and receives a monthly annuity check from the federal Government. Any business or fund-raising organization for which such individuals might be an attractive market could get from the Government, at nominal cost, a list of prime sales prospects to solicit. Armed with this information, interested businesses, charities, and individuals could, and undoubtedly would, subject the listed annuitants "to an unwanted barrage of mailings and personal solicitations." *Minnis*, 737 F.2d at 787. In light of the Supreme Court's affirmation, in a different context, that "[t]he ancient concept that 'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality ...," such a fusillade cannot readily be deemed a *de minimis* assault on the privacy of those within.

NARFE contends nonetheless that any such interference with the annuitants' privacy interests would be insufficient to support non-disclosure under Exemption 6. It relies for this proposition (as did the district court) upon *Ditlow, Getman v. NLRB*, 450 F.2d 670 (D.C.Cir.1971), and *Disabled Officer's Ass'n v. Rumsfeld*, 428 F.Supp. 454 (D.D.C.1977), *summarily aff'd*, 574 F.2d 636 (D.C.Cir.1978), each of which held

that a name and address list was not within Exemption 6.

In *Getman,* the court expressly relied upon the proposition that the balancing requirement of "Exemption 6 carries with it an implicit limitation that the information, once disclosed, [may] be used only by the requesting party and for the public interest purpose upon which the balancing was based," 450 F.2d at 677 n. 24, a view that, as we have seen, above at 4–5, cannot be squared with the Supreme Court's subsequent decision in *Reporters Committee.* If that proposition were correct, then the only threat to their privacy that voters in certain union representative elections faced would have been a solicitation to participate in the plaintiffs' academic study—a "relatively minor invasion of privacy," as we said. *Id.* at 675. Thus, *Getman* is not (except in its adoption of a legal standard that was later disapproved) in any sense contrary to our analysis here.

In *Ditlow,* Judge Leventhal determined that disclosure of the list of airline passengers, though "not a clearly inconsequential loss of privacy ... would result in less than a substantial invasion of privacy." 517 F.2d at 170. As we have seen, however, the court reached that conclusion based upon the understanding that (whether because of practical realities or of the limitation in *Getman* is not clear) "the only consequence of the exposure here is a mailed notice informing the person that he is a member of a class and may be awarded damages...." *Id.* at 170 n. 15. The consequences in the case before us are likely to be more significant because the name and address list at issue here is of apparent commercial value.

Finally, in *Disabled Officer's,* which is factually similar to this case, the district court anticipated that release of the names and addresses of disabled military retirees "could expose them to unwanted solicitation or even harassment," but ordered it anyway. The court expressly proceeded on the understanding, however, that Exemption 6 is not implicated absent the disclosure of "the intimate details of [an individual's] personal li[fe]...." 428 F.Supp. at 458. That premise was proved erroneous in *Washington Post.* 456 U.S. at 600, 102 S.Ct. at 1960.

We are thus left with circuit precedent establishing only that the disclosure of names and addresses is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.

The district court also relied upon *Department of the Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), and *Arieff v. Department of the Navy,* 712 F.2d 1462 (D.C.Cir.1983). In each case, the Government opposed disclosure of certain information on the ground that, although the records in question did not on their face identify particular individuals, sufficiently motivated members of the public might be able to link the information to specific individuals. In *Rose,* the Supreme Court responded to this suggestion by observing that "Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities." 425 U.S. at 380 n. 19, 96 S.Ct. at 1608 n. 19. In a dictum in *Arieff,* we stated more broadly that Exemption 6 "does not apply to an invasion of privacy produced *as a secondary effect* of the release.... [I]t is the very 'production' of the documents which must 'constitute a clearly unwarranted invasion of personal privacy.'" 712 F.2d at 1468 (emphasis in original). The district court thought that these cases stand for the proposition that

this circuit has recognized only a slight privacy interest in a person's name and address, and has discounted, if not ignored, the possible secondary effects that the release of such information might have on the addressee. Unless the release of names and addresses, *standing alone,* will *embarrass* the individuals involved, [the privacy interest in their non-disclosure is] entitled to little protection.

633 F.Supp. at 1244 (emphases added). This is a misinterpretation of *Rose* and an overreading of *Arieff.*

In virtually every case in which a privacy concern is implicated, someone must take steps after the initial disclosure in order to bring about the untoward effect. Disclosure does not, literally by itself, constitute a harm; it is the requester's (or another's) reaction to the disclosure that can sting. This is only more obvious where disclosure of the information invades someone's privacy not because it is embarrassing but because it invites unwanted intrusions. Where there is a substantial probability that disclosure will cause an interference with personal privacy, it matters not that there may be two or three links in the causal chain. The concern in *Rose* is not, as the district court would have it, with the number of steps that must be taken to get to the threatened effect; rather, *Rose* turns upon the likelihood that the effect will ever come to pass. In that case, there was substantial doubt that any invasion of privacy would occur, and it was that uncertainty that led the court to rule as it did. In this case, there is little reason to doubt that the barrage of solicitations predicted will in fact arrive—in the mail, over the telephone, and at the front door of the listed annuitants.

Furthermore, any doubt about the meaning of *Rose* was dispelled by the Supreme Court in *Reporters Committee*, where it said that

> even with names redacted [as the requester in *Rose* admitted was proper], subjects of such summaries can often be identified through other, disclosed information.... [W]e recognized the potential invasion of privacy through later recognition of identifying details, and approved the Court of Appeals' rule permitting the District Court to delete 'other identifying information' [*i.e.*, other than names] in order to safeguard this privacy interest.

109 S.Ct. at 1479. Clearly, the Court's concern is not limited to those FOIA cases, if any such cases there be, in which the feared invasion of privacy is caused by the release itself, and the better reading of *Arieff* is not to the contrary. The court there painted with a broad brush, but it covered only a modest area; the relevant point being made was that the "mere speculation" of the sort that would be stimulated by disclosure of the drugs being prescribed for unnamed Justices of the Supreme Court, Members of Congress, and their senior staffs is not itself part of the invasion of privacy contemplated by Exemption 6—not because it would be a "secondary effect," but because there was no substantial likelihood that any concrete facts about a particular individual could be inferred.

For the Exemption 6 balance to be implicated, there must, of course, be a causal relationship between the disclosure and the threatened invasion of privacy. Here, there is a substantial probability that the disclosure will lead to the threatened invasion: one need only assume that business people will not overlook an opportunity to get cheaply from the Government what otherwise comes dearly, a list of qualified prospects for all the special goods, services, and causes likely to appeal to financially secure retirees. It is clearer still that the invasion of the annuitants' privacy will be more than *de minimis;* it will be significant. Nor would the invasion be any less under NARFE's alternative request, made in its supplemental brief, for only the addresses and not the names of the annuitants. As the above analysis makes clear, the privacy concerns raised by the release of the addresses alone are substantially identical to those raised by the release of both the names and addresses.

## B. *The Public Interest*

In *Reporters Committee*, the Supreme Court held that, in assaying the public interest, we must examine "the nature of the requested document and its relationship to 'the basic purpose of [FOIA] to open agency action to the light of public scrutiny.' " 109 S.Ct. at 1481 (quoting *Rose*). The Court went on to state that FOIA's

> basic policy ... focuses on the citizens rights' to be informed about "what their government is up to." Official informa-

tion that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct.

*Id.* That statement is nearly sufficient to resolve this case, for NARFE's only significant public interest claim, as it originally framed this case, was that disclosure of the annuitants' names and addresses would aid NARFE in its lobbying activities, and thus result in the passage of laws that would benefit the public in general and federal retirees in particular. Under *Reporters Committee,* these considerations are not relevant; they involve not "what the[ ] Government is up to," but only what it might be up to if NARFE had its druthers.

In order to place something on the public interest side of the balance, NARFE suggests, in its supplemental brief, several afterthoughts about the ways in which its interests fall within the ambit of FOIA's purpose, as explicated in *Reporters Committee.* The only argument that merits treatment here is that disclosure of the names and addresses of federal annuitants "would inform the public, at least in part, where its money is going." The Court rejected a similar claim in *Reporters Committee* itself, however, ruling that the rap sheet of a person who "allegedly had improper dealings with a corrupt Congressman and ... is an officer of a corporation with defense contracts" did not affect the public interest because "it would tell us nothing directly about the character of the *Congressman's* behavior" or "the conduct of the *Department of Defense*" in awarding the contracts. *Id.* at 1482 (emphases in original). The lesson for this case, *mutatis mutandis,* is that unless the public would learn something directly about the workings of the *Government* by knowing the names and addresses of its annuitants, their disclosure is not affected with the public interest. While we can see how the percentage of the federal budget devoted to annuities, the amount of the benefit an average annuitant receives, or other aggregate data might be of public interest, disclosure of those facts would not be entailed in (and could be accomplished without) releasing the records NARFE seeks here. The simple fact is that those records say nothing of significance about "what the[ ] Government is up to."

### C. *The Balance*

We have been shown no public interest in, and a modest personal privacy interest against, disclosure of the names and addresses of individuals receiving federal employee retirement benefits. We need not linger over the balance; something, even a modest privacy interest, outweighs nothing every time.

The Supreme Court in *Reporters Committee* noted that "categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." *Id.* at 1483. Just as the Supreme Court did not leave open the possibility that the rap sheet of some subjects might be disclosable and others exempt from disclosure, therefore, we need not inquire into the extent to which each individual whose name would be disclosed would suffer invasions of his or her privacy. Although some federal annuitants might welcome NARFE's literature and the various solicitations that would follow in its wake, no one has suggested that they can be differentiated, either in practice or as a matter of law, from others who might feel differently. It is enough that, with respect to federal annuitants as a group, the privacy concerns inherent in the release of their names and addresses are not insubstantial. We need not determine whether the category should be more broadly defined—to include the names and home addresses of current federal employees, for example—in order to resolve the case before us.

### III. CONCLUSION

We conclude that disclosure of the requested records "would result in a clearly unwarranted invasion of personal privacy."

The judgment of the district court is therefore

*Reversed.*