Robert LEPELLETIER, Jr., Appellant,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, et al.,
Appellees.

No. 97–5287.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1998.

Decided Jan. 5, 1999.

Robert Lepelletier, Jr., appearing pro se, argued the cause and filed the briefs for appellant.

Allison M. Zieve, appointed by the court, argued the cause as amicus curiae on behalf of appellant. With her on the briefs was Alan B. Morrison, appointed by the court.

Jaclyn C. Taner, Counsel, Federal Deposit Insurance Corporation, argued the cause for appellees. With her on the brief were Ann S. DuRoss, Assistant General Counsel, and Lawrence H. Richmond, Acting Senior Counsel. Michelle Kosse and Robert D. McGillicuddy, Counsel, entered appearances.

Before: EDWARDS, Chief Judge, WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Robert Lepelletier, Jr., an independent money finder, seeks the release of the names of depositors with unclaimed funds at three banks for which the Federal Deposit Insurance Corporation ("FDIC") is now the receiver. In the seven years since the FDIC began its receiverships, agency officials have sent only one notice to the last known addresses of the banks' depositors. Approximately $3.5 million is at stake; if the money in question remains unclaimed, it will be forfeited to the FDIC.

In December 1995, pursuant to a Freedom of Information Act ("FOIA") request filed by Lepelletier, the FDIC released a list of the amounts of all unclaimed deposits, as well as the governmental entities and deceased individuals associated with unclaimed deposits. The FDIC refused, however, to release the names of corporations and living individuals whose deposits remained unclaimed. Lepelletier then filed suit in District Court and advanced three principal causes of action: (1) he asserted that, under FOIA, the FDIC was required to release all of the names of parties with unclaimed deposits; (2) he contended that, under the due process clause of the Fifth Amendment, the FDIC was required to publish the names of all parties with unclaimed funds, along with the precise amounts due to each party, before forfeiting the funds; and, finally, (3) he claimed that the FDIC breached an agreement with him, pursuant to which he was to find former bank funds and advise the agency how it could recover those funds, and then "falsely" induced him to enter settlement negotiations.

The District Court dismissed Lepelletier's contract-related claims, and granted summary judgment in favor of the FDIC on his due process and FOIA claims. We affirm the District Court's dismissal of Lepelletier's contract-related claims, but reverse in part its grant of summary judgment in favor of the FDIC on the other two claims. We reject Lepelletier's claim that he is entitled to a list of the precise amounts due to each named depositor. However, we find that he has stated a viable claim that the FDIC may be legally obliged to disclose the names of certain depositors. The general issue to be resolved, under both FOIA and the due process clause, is whether public disclosure can be justified by reason of a depositor's pecuniary interest in recovering the funds, as against that person's countervailing interest in privacy.

We find that Lepelletier has standing to assert a due process claim on behalf of the depositors with unclaimed funds. In addition, because the District Court failed to develop evidence relevant to the adequacy of the depositors' notice and failed to weigh that evidence as required by established case law, we must remand the case for a determination of whether the FDIC's notice to the depositors was consistent with due process. We also remand Lepelletier's FOIA claim, because the depositors' interest in discovering the amounts that they are owed may outweigh their privacy interest, thus requiring the release of their names under FOIA.

## I. BACKGROUND

### A. The FDIC Receiverships

On August 10, 1991, the Office of the Comptroller of the Currency closed the National Bank of Washington. On May 10, 1991, that office had also closed the Madison National Bank of Washington, D.C. and the Madison National Bank of Virginia. After closing, the three banks were placed under FDIC receivership. *See* 12 U.S.C. § 1821(c)(2)(A)(ii) (1994). As receiver, the FDIC assumed control of all bank records, *see id.* § 1821(d)(2)(A)(ii), and was also required to pay off all insured deposits from the three banks, either by paying cash to requesting depositors, or by depositing funds that would be available to each depositor at other local banks. *See id.* § 1821(f).

At the time of the receiverships in this case, the FDIC was only required to send one notice to depositors at their last known addresses, advising the depositors of their unclaimed funds. *See* 12 U.S.C. § 1822(e) (Supp. IV 1992) (amended 1993). After sending the notices, the FDIC had to allow at least three months for depositors to make claims; however, all claims had to be made within eighteen months of the appointment of the receiver. *See id.* Any deposits not claimed within eighteen months were to be "refunded" to the FDIC. *See id.*

In 1993, Congress revised the notification procedures of § 1822(e). *See* Unclaimed Deposits at Insured Banks and Savings Associations, Pub.L. No. 103–44, 107 Stat. 220 (1993) ("Act"). For receiverships established after the 1993 law went into effect, the FDIC is required to mail two notices to the "last known address of the depositor appearing on the records" of the bank: the first must be sent within thirty days of the FDIC's first payment to depositors in its role as receiver; the second must be mailed fifteen months later to all depositors who did not respond to the first notice. *See id.* §§ 1 (codified at 12 U.S.C. § 1822(e)(1) (1994)), 2(a). For those receiverships that began after January 1, 1989 and were still in progress at the time of the enactment of the new law, however, the notification procedures remained the same as they were prior to the passage of the Act.

Although the notification procedures did not change, the new law did change some aspects of existing receiverships. First, the time limit for depositors to claim their money was extended to the date when the FDIC terminates the receivership. *See id.* § 2(b). Second, states could, within 120 days after the passage of the Act, request the name and address of any depositor eligible to make a claim. *See id.* § 2(c). However, there is no requirement that the FDIC notify the depositors of these changes in the law, and it did not do so here. *See Lepelletier v. FDIC,* 977 F.Supp. 456, 464 (D.D.C.1997). Indeed, with respect to the depositors at issue in this case, the FDIC has sent only one notice to the depositors at their last known addresses as required by the previous version of § 1822(e). Thus, even though approximately $3.5 million remains unclaimed, no additional notices have been sent in the seven years since the FDIC began its receivership.

On December 22, 1996, the FDIC announced its intention to terminate the receivership of the Madison National Bank of Virginia. It also "expressed a desire to terminate the receivership of the [National Bank of Washington] and Madison National Bank of Washington, D.C." *Lepelletier,* 977 F.Supp. at 459. After Lepelletier sought an injunction to prevent the FDIC from terminating the receiverships, the FDIC agreed not to take any action until this lawsuit is resolved. *See id.*

### B. Lepelletier's Lawsuit

In August 1994, Lepelletier entered into an agreement with the FDIC, in its role as receiver for the three failed banks. *See* Agreement, *reprinted in* Joint Appendix ("J.A.") 15. Under that agreement, Lepelletier was to find former bank funds and advise the FDIC as to how it could recover those funds. In return, the FDIC agreed to pay Lepelletier ten percent of any funds recovered. The FDIC terminated the agreement in February 1995. *See* Letter from James R. Foster, FDIC, to Robert Lepelletier, Jr. (Mar. 1, 1995), *reprinted in* J.A. 18.

In October 1995, Lepelletier filed FOIA requests for the names of those depositors with unclaimed deposits at the three banks.

In December 1995, the FDIC released a list of the amounts of all unclaimed deposits, as well as the names of governmental entities and deceased individuals associated with unclaimed deposits. The lists given to Lepelletier indicate that approximately $3.5 million remains unclaimed. *See* Brief of the Appellant at 8. Although the FDIC released the amounts of the unclaimed deposits, it refused to release the names of corporations and living individuals associated with those deposits, citing Exemption 4, 5 U.S.C. § 552(b)(4), and Exemption 6, 5 U.S.C. § 552(b)(6), of FOIA.

When the FDIC refused to release the complete list of depositors' names, Lepelletier filed suit against the FDIC and three of its officials. He alleged that, under FOIA, the FDIC was required to release all of the names of parties with unclaimed deposits. He also argued that, because the District of Columbia had published some names with unclaimed deposits in the *Washington Times* in August 1994 at the FDIC's request, the information was no longer protected. In addition, he claimed that under the due process clause of the Fifth Amendment, the FDIC was required to publish the names of all parties with unclaimed deposits before forfeiting the funds, rather than simply send notices to the last known addresses pursuant to the pre-amendment version of § 1822(e). Finally, Lepelletier asserted that the FDIC had breached its 1994 agreement with him and then "falsely" induced him to enter into settlement negotiations.

The FDIC officials moved to dismiss the FOIA claim as to them, because individuals are not proper defendants to a FOIA action. The FDIC also moved to dismiss the contract claim, arguing that (1) Lepelletier had not alleged that he was due anything under the agreement, (2) the failure to reach a settlement before litigation does not give rise to a cause of action, and (3) the complaint contradicted Lepelletier's assertion that the FDIC "falsely" induced him into settlement talks. The District Court granted the motions to dismiss on January 23, 1997. *See Lepelletier v. FDIC*, No. 96–1363, Order (D.D.C. Jan. 23, 1997), *reprinted in* J.A. 65–66.

The parties then moved for summary judgment on the remaining issues. On September 8, 1997, the District Court granted summary judgment in favor of Lepelletier with respect to the FDIC's withholding of the names of corporations with unclaimed funds. *See Lepelletier*, 977 F.Supp. at 460. The court held that Exemption 4, which protects "confidential" financial information, did not apply here. The FDIC did not appeal this ruling.

On the remaining claims, however, the District Court granted summary judgment in favor of the FDIC. With respect to the withholding of the names of living individuals with unclaimed funds under Exemption 6, which permits the FDIC to withhold information if its disclosure would constitute an unwarranted invasion of a person's privacy, the court held that, while "[a] slight privacy interest is at stake in this case," Lepelletier had not identified any public interest in disclosure of the information. *See id.* at 461. Accordingly, the FDIC had properly withheld the depositors' names under FOIA. The court also found that, although Lepelletier argued that the information had been printed in the *Washington Times* and, thus, had become publicly available, he had failed to show that the specific information he sought was duplicated in the public domain. *See id.* at 461–62. Absent this showing, the court held that Lepelletier was not entitled to the information. *See Public Citizen v. Department of State*, 11 F.3d 198, 201 (D.C.Cir.1993).

On Lepelletier's due process claim, the court first found that Lepelletier had standing to bring the claim in light of his interest as an independent money finder in developing a business relationship with those who had unclaimed deposits, and because his interest in obtaining publication of their names was consistent with their interest in receiving notice of the unclaimed deposits that they could not claim without notice. *See Lepelletier*, 977 F.Supp. at 462–63. On the merits of Lepelletier's claim, however, the trial court found that the FDIC had satisfied the due process clause by sending written notice to the holders of unclaimed deposits at their last known addresses, as required by the

preamendment version of § 1822(e). *See id.* at 463–64.

## II. ANALYSIS

This appeal presents four major issues: (1) whether Lepelletier has standing to raise the due process claim; (2) whether the notification procedures employed by the FDIC in this case satisfied due process; (3) whether the names of the depositors with unclaimed funds must be released under FOIA; and (4) whether the District Court properly dismissed Lepelletier's contract-related claims. We begin with Lepelletier's due process claim.

### A. Due Process

Lepelletier argues that the District Court erred in granting summary judgment in favor of the FDIC on his due process claim. Because there is no dispute regarding the material facts of this case, "we focus on the court's application of relevant law." *Painting and Drywall Work Preservation Fund, Inc. v. HUD,* 936 F.2d 1300, 1302 (D.C.Cir. 1991). We begin with whether Lepelletier has standing to raise a due process claim.

### 1. Lepelletier's Standing

Because Lepelletier seeks to raise the rights of third parties—the depositors—he must show that he has standing under Article III, *and* that he satisfies third party, or *jus tertii,* standing requirements. *See Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623–24 n. 3, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989). The District Court found that Lepelletier had shown both, and we agree.

■ Article III standing requires that Lepelletier demonstrate that he has suffered an injury that "is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the inju-

ry will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations, internal quotation marks, and footnote omitted).

■ In this case, Lepelletier's alleged injury is the "denial of the opportunity to develop a business relationship with depositors who have unclaimed deposits." *Lepelletier,* 977 F.Supp. at 462. The FDIC contends that this allegation is not enough, and that Lepelletier must have existing contracts with the depositors to locate their unclaimed funds before he can show an injury sufficient to support standing. *See* Brief for Appellees at 11. This court, however, has held that the denial of a business opportunity satisfies the injury requirement. For example, in *CC Distributors, Inc. v. United States,* 883 F.2d 146, 150 (D.C.Cir.1989), the court found that a group of contractors who had operated civil engineer supply stores for the Air Force had standing to challenge the Department of Defense's decision to convert the program under which they had previously operated to an in-house operation. In so finding, the court stated that "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* ... even though the plaintiff may not be able to show that it was *certain to receive* the benefit had it been accorded the lost opportunity." *Id.*; *cf. West Va. Ass'n of Community Health Ctrs. v. Heckler,* 734 F.2d 1570, 1575 (D.C.Cir.1984) (noting that in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), "the individual plaintiff's injury was the denial of an opportunity to obtain housing for which he would otherwise be qualified. Certainty of success in seeking to exploit that opportunity was not required."). Because Lepelletier has credibly alleged he will suffer the loss of a business opportunity, he has satisfied the injury requirement of the Article III standing analysis.

Next, Lepelletier must show that his injury is the result of the FDIC's actions. Lepelletier also satisfies this requirement, because Lepelletier's alleged injury stems from the FDIC's refusal to release the names of those with unclaimed deposits. Moreover,

the FDIC is in the process of terminating its receivership of the banks, in which case the funds would become the property of the FDIC. Thus, the District Court also correctly found that Lepelletier had met the second requirement of standing.

The final requirement is that Lepelletier must show that his injury may be redressed by the court. The relief Lepelletier seeks is a declaration that the notice provided under the pre-amendment version of § 1822(e) is not constitutionally adequate *and* that public disclosure of the depositors' names is required. ·A possible problem for Lepelletier with respect to the redressability prong of standing is that a court could hold that, even though the notice provided to the depositors was constitutionally infirm, a remedy short of full public disclosure would be adequate. Such a remedy would not appear to redress Lepelletier's injury, because he would not learn the names of parties with unclaimed deposits and, as a consequence, he would remain unable to contact those individuals in the hope of soliciting business from them.

We need not struggle with this concern, however, because the possibility of public disclosure, "though not a certainty, is sufficient to meet the redressability requirement." *Northeast Energy Assocs. v. FERC,* 158 F.3d 150, 154 (D.C.Cir.1998); *see also Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 457–58 (D.C.Cir.1998) (holding that the possibility that the EPA would change its rules if the ones it had promulgated were vacated satisfied the redressability requirement because it gave the petitioner the opportunity of a favorable outcome in the new rulemaking). Thus, because it is possible that the court could find that the names should be published, Lepelletier has satisfied this final requirement. We therefore find that Lepelletier has standing under Article III to bring a due process claim.

■ Next, we must determine whether Lepelletier, as a third party, may raise a claim alleging a violation of the *depositors'* due process rights. Although the "limitations on a litigant's assertion of *jus tertii* are not constitutionally mandated, ... [they] stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig v. Boren,* 429 U.S. 190, 193, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

■ The Supreme Court has articulated three prudential considerations to be weighed when determining whether an individual may assert the rights of others: (1) "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute," (2) "the litigant must have a close relation to the third party," and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (quoting *Singleton v. Wulff,* 428 U.S. 106, 112–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)); *see also Craig,* 429 U.S. at 195–96, 97 S.Ct. 451.

■ In this case, the first and third factors are easily satisfied. As discussed above, Lepelletier has suffered an injury in fact— the loss of a real business opportunity— which gives him a concrete interest in the resolution of this suit. There is also a hindrance preventing the depositors from protecting their interests: the depositors are likely unaware of their unclaimed funds, and these funds soon will be forfeited to the FDIC. And even though a depositor may be able to bring a due process claim after the money is forfeited to the FDIC, the likelihood of a depositor discovering his right to the unclaimed funds without additional notice appears rather remote. Thus, the hindrance to the depositors here is sufficient to satisfy the third prudential concern.

The second factor—whether there is a "close relation" between Lepelletier and the depositors—is more troubling than the other two, but we nevertheless find that it is satisfied here. As the District Court pointed out, the reason for the "close relation" factor is "to ensure that the plaintiff will act as an effective advocate for the third party." *Lepelletier,* 977 F.Supp. at 463; *see also Singleton,* 428 U.S. at 114–15, 96 S.Ct. 2868. Here, Lepelletier seeks to sell his services to the depositors. But because Lepelletier does not even know the names of the depositors, he

"has no close and confidential relationship with the depositors." Brief for Appellees at 14. However, the Court has never required a *confidential* relationship between the parties in order to have standing. To the contrary, it has only required a "close relation" in the sense that there must be an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests. Because vendors and their customers often have an identity of interests, "vendors ... have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig,* 429 U.S. at 195, 97 S.Ct. 451. For example, in *Craig,* the court held that a beer vendor could challenge, on behalf of males between the ages of 18 and 21, a law prohibiting the sale of beer with 3.2% alcohol to males under 21 and females under 18, because "the threatened imposition of governmental sanctions might deter ... vendors from selling beer to young males, thereby ensuring that 'enforcement of the challenged restriction against the [vendor] would result indirectly in the violation of third parties' rights.'" 429 U.S. at 195, 97 S.Ct. 451 (quoting *Warth v. Seldin,* 422 U.S. 490, 510, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *see also Carey v. Population Servs. Int'l,* 431 U.S. 678, 683, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (finding that corporation that sold nonmedical contraceptives by mail order had standing to challenge a law prohibiting the sale of its products "not only in its own right[,] but also on behalf of its potential customers").

This case differs somewhat from *Craig* and other like cases, because Lepelletier is not threatened with the imposition of sanctions for violating the law at issue. That is, he does not face the possibility of prosecution for illegally selling to third parties. But this circuit, looking to *Craig* and its progeny, has found that a vendor who is prevented from selling his product to third parties by *any* unlawful regulation, may challenge that regulation "on the basis of 'the vendor-vendee relationship alone.'" *National Cottonseed Prods. Ass'n v. Brock,* 825 F.2d 482, 492 (D.C.Cir.1987) (quoting *FAIC Secs., Inc. v.*

*United States,* 768 F.2d 352, 361 (D.C.Cir. 1985)).

In *FAIC Securities,* an individual deposit broker and a national trade association whose members included deposit brokers challenged regulations that altered federal insurance coverage of deposits from $100,000 per *depositor,* per financial institution to $100,000 per *broker,* per financial institution. *See* 768 F.2d at 355–56. The brokers argued that these regulations effectively put them out of business, and thus, investors would be deprived of the benefits of using a broker to place their deposits as advantageously as possible. Then–Judge Scalia, writing for the court, found that the association and the individual broker satisfied the *jus tertii* requirements, and therefore could properly challenge the regulations at issue. *See id.* at 359–61. In so holding, the court specifically pointed out that the statute at issue did not make the broker's sale unlawful, but:

> [r]eliance upon [a distinction between those statutes that made the proposed sale unlawful and those that did not] would produce a rule under which the necessity of establishing the third-party vendee's inability to sue for violation of statute (or constitutional provision) $X$ would depend upon whether or not the plaintiff vendor's activities were explicitly proscribed by statute $Y$. The logic that might underlie such a rule is not immediately apparent.... [Thus,] we feel constrained to follow the holdings in *Craig* and *Carey* which base standing upon the vendor-vendee relationship alone....

*See id.* at 360–61.

This holding was later followed in *National Cottonseed,* in which 3M challenged the Occupational Safety and Health Administration's ("OSHA") effectiveness rating of the disposable respirator it manufactured. Although it was not unlawful for 3M to sell its respirator with a lower effectiveness rating, it sought a higher rating, because filters with higher ratings could be used in environments with higher dust concentrations under OSHA regulations. It therefore argued that its sales had been reduced as a result of the lower rating given to disposable filters. OSHA argued that 3M did not have standing

to challenge its filter effectiveness ratings, because the purchaser of the filter, not the manufacturer of the filter, had to comply with OSHA regulations. The court in *National Cottonseed* concluded that:

> *FAIC Securities* continues to state law of the circuit, binding upon us unless and until changed by the court sitting en banc, or shown to be incorrect by instruction from Higher Authority. If the *FAIC Securities* deposit brokers' and depositors' interests are "two sides of the same coin," so too are 3M's interest in selling the disposable respirators it manufactures, and cotton processing plant operators' interest in purchasing the respirators. If the brokers had standing in *FAIC Securities*, then 3M has standing here; no tenable distinction can be drawn between the relationship of the litigant and third party in the two cases. Following *FAIC Securities*, we are constrained to recognize 3M's standing on the basis of "the vendor-vendee relationship alone."

825 F.2d at 491–92 (footnotes and citations omitted).

Here, much like the brokers in *FAIC Securities* who alleged that the unlawful change to federal insurance coverage regulations would cause them business losses, Lepelletier argues that he has been prevented from capitalizing on a business opportunity, because the pre-amendment version of § 1822(e) failed to provide proper notice to the depositors. Moreover, in *FAIC Securities*, the brokers' objective of having the same insurance coverage for deposits made with or without the aid of a broker was consistent with the investors' interest in using a broker to find the highest interest rates for their deposits. Likewise, Lepelletier's "objective of achieving publication of the names is consistent with the depositors' interest in receiving notice of their unclaimed deposits before they revert to FDIC." *Lepelletier*, 977 F.Supp. at 463. Thus, although Lepelletier's interest does not correspond exactly with the depositors' interests, *i.e.*, the best notice for the depositors may not make their names available to Lepelletier, *jus tertii* standing does not require a perfect match. Accordingly, Lepelletier has satisfied the "close relation"

requirement of *jus tertii* standing based on his potential vendor-vendee relationship with the depositors.

In sum, we find that Lepelletier has satisfied both the Article III standing requirements, and the prudential *jus tertii* standing requirements. He may therefore pursue a due process claim in this case.

### 2. The Merits

Lepelletier argues that the single notice mailed to the last known addresses of the depositors pursuant to the preamendment version of § 1822(e) failed to satisfy due process requirements. The District Court, relying on *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), disagreed, finding that "the Constitution requires only that the government take reasonable steps to notify depositors, not all possible steps or the very best ones." *Lepelletier*, 977 F.Supp. at 464. It held that Lepelletier had failed to show that the notice provided by the FDIC was "unreasonable under the circumstances," and, accordingly, granted summary judgment in favor of the FDIC on this claim. *Id.*

■■■ When presented with a due process challenge, a court must determine, first, whether there has been a deprivation of a property interest, and, if so, what process is due. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C.Cir.1991). It is clear that the depositors have a protected property interest in their unclaimed funds. Thus, the only question here is whether they have received the process they are due. As mentioned above, the District Court found that the due process rights of the depositors had not been violated, because they had received adequate notice. However, in the course of its decision, the District Court did not cite the seminal due process case of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), nor did it consider the three factors articulated in that case:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and

the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. 893.

We have previously noted that "[t]he precise form of notice ... depends upon a balancing of the competing public and private interests involved, as defined by the now familiar *Mathews* factors." *Propert,* 948 F.2d at 1332. We find, therefore, that the District Court erred by failing to address the *Mathews* factors when determining that the FDIC had provided adequate notice to the depositors. Accordingly, we remand this portion of the case to the District Court so that it may properly gather evidence related to the *Mathews* factors and then weigh those factors.

We note that, on remand, the District Court is free to consider the amount of money in each account, as well as the incremental cost of additional notice, in determining what process is due. It may also find, after balancing the factors, that depositors with larger amounts of unclaimed funds are entitled to additional notice procedures not necessarily due to depositors with smaller amounts. However, because the inquiries necessary to resolve this claim are very fact-specific, we leave it to the District Court to determine at what threshold(s) additional notification efforts, if any, are required. Finally, we note that, although the FDIC has repeatedly pointed out that "[a]lmost 99.9% of the deposits were claimed," *e.g.,* Brief for Appellees at 17, this fact is simply irrelevant to a determination of what notice is due to those with *unclaimed* deposits.

## B. FOIA Claim

■ Lepelletier also argues that the District Court erred in finding that the FDIC did not violate FOIA when it refused to release the names of living individuals with unclaimed deposits. The FDIC refused to release the names of depositors under Exemption 6 of FOIA, which allows the FDIC to withhold "personnel and medical files and

similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1994). The Supreme Court has interpreted the phrase "similar files" to include all information that applies to a particular individual. *See United States Dep't of State v. Washington Post Co.,* 456 U.S. 595, 602, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982). It has also found that "[i]ncorporated in the 'clearly unwarranted' language is the requirement for ... [a] 'balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information.'" *United States Dep't of Defense Dep't of Military Affairs v. FLRA,* 964 F.2d 26, 29 (D.C.Cir.1992) (quoting *Department of Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). Thus, a court must weigh the "privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." *National Ass'n of Retired Fed. Employees v. Horner,* 879 F.2d 873, 874 (D.C.Cir.1989) ("*NARFE*"); *see also Department of Defense Dep't of Military Affairs,* 964 F.2d at 29 ("[A]gencies and reviewing courts consider whether disclosure of the requested information would result in an invasion of privacy, and if so, the extent and seriousness of that invasion, as well as the extent to which disclosure would serve the public interest."). We begin with the public interest in disclosure of the depositors' names.

■ "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *United States Dep't of Defense v. FLRA,* 510 U.S. 487, 497, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994). In this case, Lepelletier has argued that, because "the FDIC, itself, gets to keep any unclaimed funds after the termination of the receivership(s)," keeping the funds without adequately notifying the depositors constitutes "criminal and civil con-

version by the FDIC." Brief of the Appellant at 18. Thus, Lepelletier's argument appears to be that, if the FDIC provides the information he seeks, the public will know how much money the FDIC will recover once the receiverships are terminated.

We find no merit to this argument. In *NARFE*, this court was asked to decide whether there was any public interest in releasing to the National Association of Retired Federal Employees ("NARFE"), the names and addresses of those people receiving annuity payments from the Office of Personnel Management ("OPM"). *See* 879 F.2d at 878–79. In finding that it did not, the court held that:

> [t]he lesson for this case . . . is that unless the public would learn something directly about the workings of the *Government* by knowing the names and addresses of its annuitants, their disclosure is not affected with the public interest. While we can see how the percentage of the federal budget devoted to annuities, the amount of the benefit an average annuitant receives, or other aggregate data might be of public interest, disclosure of those facts would not be entailed in (and could be accomplished without) releasing the records NARFE seeks here. The simple fact is that those records say nothing of significance about "what the[ ] Government is up to."

879 F.2d at 879.

This case falls within the logic of *NARFE*. The FDIC provided the amounts of all unclaimed deposits to Lepelletier in December 1995. As a result, Lepelletier already knows the total amount that remains unclaimed (approximately $3.5 million), as well as the amount in each account that remains unclaimed. What he seeks here are the names associated with those accounts. But those names will not shed light on the FDIC's performance of its duties, because they do not speak to the issue of how much money will be recovered by the FDIC upon termination of the receiverships. Nor do the names speak to what the agency has done in preparing for the termination of these receiverships. Accordingly, there is no clearly discernible public interest in releasing the names associated with the unclaimed deposits, because such a release would not inform the public of what the FDIC is "up to."

The next question, then, is whether there is a privacy interest in the release of the depositors' names. The District Court found that the depositors had a privacy interest in the information sought by Lepelletier, albeit a slight one. *Lepelletier*, 977 F.Supp. at 461. It then held that, because there was no public interest and a slight privacy interest, it did not need to " 'linger over the balance; something, even a modest privacy interest, outweighs nothing . . . every time.' " *Id.* (quoting *NARFE*, 879 F.2d at 879).

We agree with the District Court that there appears to be some privacy interest at stake in this case. Indeed, this court has often held that individuals have a privacy interest in the nondisclosure of their names and addresses in connection with financial information. *See Painting and Drywall*, 936 F.2d at 1302–03 (seeking release of name, address, and wage data); *NARFE*, 879 F.2d at 875–76 (requesting release of name, address, and annuitant status). Even more importantly, this court has been particularly concerned when the information may be used for solicitation purposes. *See Painting and Drywall*, 936 F.2d at 1303 ("[T]he workers would experience a significant diminution in their expectations of privacy because that same information would also have to be provided, for example, to creditors, salesmen, and union organizers. The dissemination of this sort of information about private citizens 'is not what the framers of the FOIA had in mind.' ") (citation omitted); *NARFE*, 879 F.2d at 876 (" 'When it becomes a matter of public knowledge that someone is owed a substantial sum of money, that individual may become the target for those who would like to secure a share of that sum by means scrupulous or otherwise.' ") (quoting *Aronson v. HUD*, 822 F.2d 182, 186 (1st Cir.1987)).

However, this case is distinguishable from the court's previous cases in an important respect: the individuals in those cases had no clear interest in the disclosure of their names and addresses. In other words, unlike the instant case, the individuals in the aforecited cases had no clear prospect of securing a direct benefit by virtue of disclosure. In

*Painting and Drywall,* a nonprofit cooperative sought the disclosure of the names, addresses, and social security numbers associated with those who had been employed by three Department of Housing and Urban Development-assisted projects to ensure compliance with "laws affecting public-works projects in California." 936 F.2d at 1301. The court found that the disclosure of this information "would constitute a substantial invasion of privacy," because the "same information would have to be provided, for example, to creditors, salesmen, and union organizers." *Id.* at 1303. And the employees in *Painting and Drywall* had no clear interest in the release of this information; the only possible benefit to them was "that the information would facilitate investigation of government efforts to enforce" the laws. *Id.*

Likewise, in *NARFE* the court found that the privacy interest associated with the release of the names and addresses of those former federal employees who received annuity payments was "significant," because there was "little reason to doubt that the barrage of solicitations predicted will in fact arrive—in the mail, over the telephone, and at the front door of the listed annuitants." 879 F.2d at 878. And the annuitants there did not have a corresponding clear interest in the release of their names. The only benefit that they could enjoy from such a release was the possible receipt of information about NARFE, an organization that sought "to protect and to further the interests of individuals eligible to participate in the federal Government's civilian retirement system." *Id.* at 874. This benefit falls far short of the clear and direct interest that the depositors have at stake in this case—namely, learning of their personal bank deposits and recovering them.

Therefore, although this court has stated that a slight privacy interest outweighs no public interest, *see NARFE,* 879 F.2d at 879, this formulation is inapposite here, *i.e.,* where the individuals whom the government seeks to protect have a clear interest in the release of the requested information. Indeed, for individuals with sizeable accounts, the interest in disclosure may be substantial. Accordingly, we hold that the FOIA analysis

under Exemption 6 must include consideration of any interest the individual might have in the release of the information, particularly when the individuals who are "protected" under this exemption are likely unaware of the information that could benefit them.

In this case, a number of the depositors have a significant pecuniary interest at stake, and disclosure of their names will greatly increase the probability that they (or their heirs) will be reunited with their funds. Thus, it is overly paternalistic to insist upon protecting an individual's privacy interest when there is good reason to believe that he or she would rather have both the publicity and the money than have neither. Accordingly, the list-of-names information sought by Lepelletier may be released under FOIA. However, because we remain particularly concerned with the possibility of invading the privacy of the depositors, and because there is no discernible public interest in disclosure, we believe any release of the depositors' names must be limited in two significant ways.

■ First, any release of names associated with the unclaimed deposits should not be matched with the amount owed to that individual. We believe that this "unmatched" list constitutes a lesser privacy invasion than a matched one. Therefore, any list that is released under FOIA may only contain the names of those with unclaimed deposits, and may not provide the corresponding unclaimed amount. (The FDIC has already released a list containing the amounts of each deposit; thus, in the end, it is possible that there will be two separate lists: one of names, and one of amounts.).

Second, on remand, the District Court must determine the dollar amount below which an individual's privacy interest should be deemed to outweigh his or her interest in discovering his or her money, such that the names of depositors with lesser amounts may be redacted. This will serve to prevent those with smaller deposits from unnecessary solicitations, while still allowing those with larger amounts to learn of their interest, albeit at the price of a few unwanted phone calls and letters.

There is one small caveat to this final step, however. If the District Court determines on remand that the depositors should receive additional notice from the FDIC under the due process clause, it may very well find that the interest of some (or perhaps all) depositors in learning of the funds available to them has been served. If so, the court must take this fact into account. Thus, if the District Court requires additional notice procedures under the due process clause, the balancing under FOIA is likely to favor non-disclosure for at least some depositors, because they will have no interest in receiving the same information repeatedly. On the other hand, if the District Court finds that additional notice is not required under *Mathews*, it may find that the interest of depositors in learning of their money, at least above some minimum amount, outweighs their privacy interest.

We therefore remand this portion of the case to the District Court to determine if the depositors' interest in learning of their money outweighs their privacy interest. If so, the court must determine if there is some minimum threshold amount below which a depositor's privacy outweighs his interest in that money. The District Court may then properly require the release of those names, without the corresponding amounts, associated with accounts that fall above the threshold level.

## C. *Lepelletier's Contract–Related Claims*

Finally, Lepelletier also appeals the dismissal of his contract-related claims. This court reviews the dismissal of Lepelletier's claims *de novo*, accepting all of his factual allegations as true and drawing all inferences in his favor. *See Systems Council EM–3 v. AT&T Corp.*, 159 F.3d 1376, 1378 (D.C.Cir. 1998). We find that the District Court did not err in dismissing these claims, because Lepelletier failed to set forth any facts in his complaint upon which relief could be granted. *See* FED.R.CIV.P. 12(b)(6).

Under the agreement Lepelletier entered into with the FDIC, Lepelletier was entitled to recover ten percent of any funds recovered by the FDIC that he had identified. *See Agreement, reprinted in* J.A. 15.

However, although Lepelletier asserts in his complaint that the FDIC breached its agreement with him, he fails to point to any funds identified by him that were recovered by the FDIC. Thus, there are no grounds upon which Lepelletier may claim breach of contract.

Lepelletier also alleges that the FDIC "falsely induc[ed him into] 'settlement' negotiations." Complaint ¶ 49, *reprinted in* J.A. 11. However, Lepelletier has not pointed to any misconduct on the part of the FDIC that would give rise to a cause of action. *See id.* ¶¶ 27–46, *reprinted in* J.A. 8–11. Accordingly, we affirm the District Court's dismissal of Lepelletier's contract-related claims.

### III. CONCLUSION

For the foregoing reasons, we affirm the District Court's dismissal of Lepelletier's contract-related claims, but we reverse in part and remand Lepelletier's due process and FOIA claims to the District Court.

*So ordered.*